UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEVIN LEE JAMES SCHMIDT,<br><br>    Petitioner,<br><br>    v.<br><br>KATHLEEN ALLISON, Secretary of the California Department of Corrections and Rehabilitation,[1]<br><br>    Respondent. | Case No. 20-cv-00219-YGR (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND DENYING CERTIFICATE OF APPEALABILITY** |

## I.   INTRODUCTION

Petitioner Devin Lee James Schmidt, a former state prisoner, brings this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of a conviction of arson of an inhabited structure obtained against him in state court.  Dkt. 1.

Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES all claims in the petition for the reasons set forth below.

## II.  BACKGROUND

### A.   Factual Background

The state appellate court handled the direct appeal filed by Petitioner in an unpublished opinion and described the relevant facts as follows[2]:

> In 2015, Schmidt lived with his mother Amy Dees and her boyfriend Joshua Rapp at Rapp's home in Eureka, California.  On November 3 of that year, Schmidt and his mother argued, and after Dees went into her room to avoid him, Schmidt either turned on or turned up the burners on the kitchen stove and left the house.  Dees turned the burners off, closed the windows and at about 1:50 p.m. left the house with a friend.
>
> A neighbor who lived across the alley had looked out her window and

---

[1] In accordance with Rule 2(a) of the Rules Governing Section 2254 Cases and Rule 25(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to substitute Secretary Kathleen Allison as Respondent because she is Petitioner's current custodian.

[2] This summary is presumed correct.  *See Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

seen Dees and Schmidt arguing in front of their garage for about 15 minutes. She saw Dees go into the house and observed Schmidt walk into the yard and in and out of the garage several times. Sometime later, while watching television, the neighbor heard the slamming of a door from Rapp's house and again looked out her window, where she saw Schmidt standing on the porch, where he bent down and then stood up. He walked away from the house with a dog on a leash and a satchel. She then saw smoke coming from the back of Rapp's home and called the fire department. While on the phone, she heard an explosion and saw more flames coming from the windows. After the explosion, she saw Schmidt continue walking away from the home with "a far off look in his eyes," "a blank look."

Within minutes of the neighbor's call, firefighters arrived. It was about 2:30 p.m. They saw smoke coming out the window of Rapp's house and a Duraflame package burning on the front porch, on top of the door mat. They moved the Duraflame package and forced their way into the house through the front door. The home was full of smoke, making visibility poor. As he searched for potential victims, firefighter Kyle Brown found a gas can with blood on it in one of the bedrooms.

At some point while away from the home, Dees checked her cell phone and saw that Rapp had texted her numerous times saying his house was on fire and urging her to come home. When she arrived, fire and police department personnel were still on the scene, and Rapp was present. Schmidt arrived sometime later. Schmidt had cuts on his hands and reddish brown stains on his clothing. He first told a firefighter his dog had bit him. A few minutes later, he told another firefighter he had cut his hands while breaking bottles with sticks. He admitted he had turned on the burners earlier in an attempt to burn his mother's food because he was angry with her. By the end of his conversations with firefighters, Schmidt had become agitated.

On the day of the fire, the firefighters' lead investigator interviewed firefighters and other witnesses and inspected the home's exterior and surrounding area. In front of a shed that was detached from the home, he found a tote bag with blood on it. He also found blood on the door to the shed and on the deck of the house. Inside the house, there was a strong smell of gasoline. There were signs of an explosion in the living room, with some indication it was the result of an accelerant. The master bedroom was in "total disarray," with overturned dressers, the bed turned over, the mattress thrown to the side, and smoke damage high up on the walls. He found overturned and charred dressers in the middle of the master bedroom along with some charred clothing. In another bedroom, he found a gas can with what appeared to be gasoline inside, and blood on the outside. In the master bathroom, there was smoke damage, a mirror had been smashed and the glass shower stall was shattered. The shattered mirror and glass did not appear to be the result of heat or fire. In the kitchen, there was moderate heat and smoke damage and the refrigerator was turned over. Smoke and heat damage to the back and side of the refrigerator indicated it had been turned over prior to the fire. There was a red gas can in the middle of a bedroom, along with some debris from firefighting efforts. He noticed blood on the gas can. At trial, the investigator opined that the fire had been set intentionally and

2

> originated from two locations in the house: at the front door and at the bottom of a dresser in the master bedroom. The stove was not the source of the fire. The investigator interviewed Schmidt, who had fresh cuts and bandages on his hands. He asked about them, and Schmidt told him he was walking around breaking sticks.
>
> Schmidt was arrested at the scene and searched before being taken to jail. He had a lighter in one of his pockets. He provided a statement at the jail after waiving his *Miranda* rights. He admitted arguing with his mother at home that day, and turning up the stove from level 6 to level 9 and leaving it unattended. His mother had been cooking french fries and his plan was to burn them. He left home at about 12:30 p.m. to attend a meeting and an alcohol recovery treatment program. He was ejected from the program at about 1:40 p.m. because he smelled like alcohol and then went behind a shopping mall and broke sticks and bottles and punched bricks. At about 3:00 p.m. he went to a gas station and bought alcohol. After that, he returned home and saw the house had been set on fire and was devastated by the sight of it. He had cut his hands on a previous day when he reached for a cup in the sink and mistakenly grabbed a knife. He had not dripped blood outside the house or on the gas cans.
>
> Rapp typically stored gasoline in the garage and backyard shed. The gas can found in the bedroom was normally stored in one of the sheds. In the weeks before the fire, he and Schmidt had done some home improvement projects that required the use of various tools and equipment Rapp had around the house. Schmidt's hands had not been injured or bleeding during those projects.
>
> From evidence processed from the scene it was determined that the blood on the gas can and the latch to the gate in the back yard matched Schmidt's DNA. A test of debris found at the scene was inconclusive regarding the presence of ignitable liquids.

*People v. Schmidt*, No. A151737, 2018 WL 1477519, at *2-3 (Cal. Ct. App. Mar. 27, 2018).

**B.   Procedural History**

  **1.   Conviction and Sentencing**

On January 19, 2017, after his first trial ended in a mistrial, a jury found Petitioner guilty of arson of an inhabited structure (Cal. Penal Code § 451(b)). 2 Clerk's Transcript ("CT") 349. On June 21, 2017, the trial court sentenced Petitioner to five years in state prison. 2 CT 408.

  **2.   Post-Conviction Appeals, Collateral Attack, and Federal Court Proceedings**

On March 27, 2018, the California Court of Appeal affirmed the judgment in an unpublished opinion. *Schmidt*, 2018 WL 1477519, at *4; Resp't Ex. 6. According to the state appellate court's opinion, Petitioner "raise[d] a single issue involving admission of two pieces of

3

evidence he claim[ed] were irrelevant and unduly prejudicial, specifically, that his blood was on a gasoline can firefighters found inside a bedroom in the home, and that he admitted having earlier in the day turned up burners on the stove in an attempt to burn his mother's food because he was angry at her." *Schmidt*, 2018 WL 1477519, at *1; *see also* Resp't Ex. 6.

On May 29, 2018, Petitioner filed his petition for review,[3] raising the same two claims as in the instant federal habeas petition: (1) an ineffective assistance of counsel ("IAC") claim against his trial counsel for failing to investigate potentially exculpatory evidence; and (2) the trial court improperly granted the prosecution's motion to exclude the criminal record of a prosecution witness. *See* Resp't Ex. 7; Dkt. 9-9 at 68. On July 11, 2018, the California Supreme Court denied review without comment. Resp't Ex. 9.

On October 24, 2018, Petitioner filed his first federal habeas petition in *Schmidt v. Jaime*, Case No. 18-6495 YGR (PR). *See* Dkt. 1 in Case No. 18-6495 YGR (PR). On August 1, 2019, the Court dismissed the petition without prejudice for failure to exhaust state court remedies. *See* Dkt 14 in Case No. 18-6495 YGR (PR). The Court noted that Petitioner had "raised his two claims (in the [first federal habeas] petition) only in his petition for review to the California Supreme Court, and that court denied the petition without comment." *Id.* at 3 (brackets added). However, the Court pointed out that "a petitioner does not fairly present a federal claim to the state courts if he seeks review of the claim for the first time on discretionary appeal." *Id.* (citing *Casey v. Moore*, 386 F.3d 896, 917-18 (9th Cir. 2004), *cert. denied*, 545 U.S. 1146 (2005) (holding petitioner did not exhaust federal claims where they were raised for first and only time in discretionary petition for review to Washington State Supreme Court)). In its determination that Petitioner had failed to exhaust his state court remedies, the Court stated as follows:

> The language of Rule 8.500 of the California Rules of Court makes clear that a petition for review to the California Supreme Court is a discretionary appeal: "As a policy matter, on petition for review the Supreme Court normally will not consider an issue that the petitioner failed to timely raise in the Court of Appeal." *See* Cal. R. Ct. 8.500(c)(1). Based on Rule 8.500 and absent any evidence or

---

[3] The California Supreme Court granted Petitioner permission to file an untimely petition for review. *See* Resp't Ex. 8.

4

> argument to the contrary, it appears unlikely that Petitioner's two claims were considered on the merits when the California Supreme Court summarily denied the petition for review. *See Castille*, 489 U.S. at 351.[4] Therefore, none of the claims in the instant petition were fairly presented to the state supreme court, and his claims are not exhausted.

*Id.* at 3 (footnote added). Thus, Petitioner's first federal petition was dismissed without prejudice because all of the claims presented in his first federal habeas petition were not exhausted. *Id.* at 4. The Court then instructed Petitioner that he "may return to state court and exhaust his claims in the state supreme court." *Id.*

On September 12, 2019, Petitioner filed a state habeas petition in the California Supreme Court, raising his two aforementioned unexhausted claims. Resp't Ex. 10. On December 18, 2019, the state supreme court summarily denied his state habeas petition. Resp't Ex. 11.

On January 10, 2020, Petitioner filed the present petition (his second federal habeas petition) raising his two newly-exhausted claims: (1) his IAC claim; and (2) his claim relating to the exclusion of the eyewitness's criminal record. Dkt. 1 at 5.[5] On May 9, 2020, the Court issued on order to show cause. Dkt. 5. After being granted an extension of time to do so, Respondent filed an answer on June 29, 2020. Dkt. 9. Petitioner then filed a traverse on August 20, 2020. Dkt. 10. This matter is fully briefed and ripe for adjudication.

### III. LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[4] *See Castille v. Peoples*, 489 U.S. 346, 351 (1989) (A federal claim is not "fairly presented" if the claim is raised by a procedural method which makes it unlikely that the claim will be considered on the merits.).

[5] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under the second prong, *see* 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a state court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). Even if constitutional error is established, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795-96

6

(2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

In applying the above standards on habeas review, the courts in this Circuit look to the decision of the highest state court to address the merits of the petitioner's claim in a reasoned decision. *See Wilson v. Sellers*, __ U.S. __, 138 S. Ct. 1188, 1192 (2018); *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the courts look to the last reasoned opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Thus, a federal court will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court precedent. *See Ylst*, 501 U.S. at 804-06; *LaJoie*, 217 F.3d at 669 n.7. Here, the Court of Appeal's decision on direct appeal is the last reasoned decision, but it addressed a different claim that was not raised in the instant federal habeas petition. *See Schmidt*, 2018 WL 1477519 at *1-4.

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011). The claims in the instant petition were presented only on state habeas to the California Supreme Court, which summarily denied relief. *See* Resp't Exs. 10 & 11. As such, these claims may be reviewed independently by this Court to determine whether that decision was an objectively unreasonable application of clearly established federal law. *Plascencia v. Alameida*, 467 F.3d 1190, 1197-98 (9th Cir. 2006) ("Because there is no reasoned state court decision denying this claim, we 'perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable.'") (citation omitted); *see Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) ("Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."). "[W]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

## IV. DISCUSSION

### A. IAC Claim

#### 1. Background

Petitioner raises an IAC claim against his trial counsel, Deputy Public Defender Kelly Neel, for failing to investigate potentially exculpatory evidence. Dkt. 1 at 5. There is no reasoned state court decision addressing this IAC claim. Thus, the Court will conduct "an independent review of the record" to determine whether the California Supreme Court's summary denial of this claim was contrary to or an unreasonable application of clearly established federal law. *Plascencia*, 467 F.3d at 1197-98; *Himes*, 336 F.3d at 853.

In his petition for review, Petitioner elaborated on his IAC claim by specifying that it was trial counsel's failure to locate certain alibi witnesses who would testify that Petitioner was at another location during the time of the arson for which he was charged. *See* Resp't Ex. 7; Dkt. 9-9 at 68. Petitioner explains that trial counsel's investigator possessed the information needed to locate these alibi witnesses but failed to conduct a proper investigation, asserting as follows:

> Public defender investigator Paul Morris was given information pertaining to the whereabouts of [Petitioner] during the fire that occurred at 2:37 pm on November 3rd 2015. I[n] an interview transcribed as people's exhibit 61 [Petitioner] states "I went and bought some alcohol at the 76." When asked what time he responds, "I don't know 2:15-3:00; probably 3:00." Mr. Morris failed to adequately investigate the case by not attempting to obtain evidence from the given location and time.

*Id.* (brackets added). Petitioner seems to be relying on the statements he made to the police in which he said the following about his whereabouts before the fire: (1) he went behind a mall and broke some sticks, broke a bottle or two, and slapped some bricks; (2) he bought an 18-pack of beer at a 76 gas station; and (3) he went home after it had burned and the fire department had arrived. Dkt. 1 at 9-10; 1 CT 279-280. Petitioner also told the police that he was by himself when he was behind the mall, but suggested that "mall security" or the "neighbor's son, with a skateboard" may have seen him. 1 CT 284-285. Petitioner's aforementioned statements were played for the jury. 2 Reporter's Transcript ("RT") 324-327.

8

### 2. Applicable Federal Law

The clearly established federal law governing IAC claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." *Id.* at 687. Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id.* at 687-688 (internal quotation marks omitted). Reviewing courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Where deficient performance is established, "[the] errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687). The *Strickland* standard applies to trial and appellate counsel. *Smith v. Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).

Under AEDPA, a federal court's review of a state court's decision on an IAC claim is "doubly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). The question is not whether counsel's actions were reasonable; rather, the question is whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105; *Bemore v. Chappell*, 788 F.3d 1151, 1162 (9th Cir. 2015) (same).

### 3. Analysis

Petitioner asserts that trial counsel failed to investigate potentially exculpatory evidence. Dkt. 1 at 5. As mentioned above, Petitioner seems to contend that public defender investigator received all the necessary information to locate certain alibi witnesses placing Petitioner at a location other than the scene of the arson at the approximate time that the fire had started. Dkt. 9-9 at 68 (citing 1 CT 284-285). However, Petitioner argues that trial counsel failed to undertake such an investigation and thus counsel presented no alibi witnesses who would have placed Petitioner behind the mall around the time the fire started. *Id.* Petitioner does not provide any names of these alibi witnesses, and, instead, he describes them as "mall security" or "the neighbor's son, with a skateboard." 1 CT 285.

To establish that counsel's failure to investigate resulted in counsel being ineffective, Petitioner must demonstrate that counsel's conduct was deficient such that it prejudiced the defense. *Strickland*, 466 U.S. at 687. The duty to investigate and prepare a defense does not require that every conceivable witness be interviewed. *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995). A defendant's mere speculation that a witness might have given helpful information if interviewed is not enough to establish ineffective assistance of counsel. *See Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001), *amended*, 253 F.3d 1150 (9th Cir. 2001).

To establish prejudice caused by the failure to call a witness, a petitioner must show that the witness was likely to have been available to testify, that the witness would have given the proffered testimony, and that the witnesses' testimony would have created a reasonable probability that the jury would have reached a verdict more favorable to the petitioner. *Alcala v. Woodford*, 334 F.3d 862, 872-73 (9th Cir. 2003).

In rejecting this IAC claim, it would have been reasonable for the state supreme court to conclude that, given the absence of specifically named witnesses, Attorney Neel made a well-informed, strategic decision to cast the police's investigation in a disparaging light rather than undertake a potentially fruitless investigation of her own. 2 RT 514-515. Indeed, Attorney Neel began her closing statement by urging the jury not to disregard that "the people charged with investigating[6] a crime didn't do the investigation or the follow up." 2 RT 504. She elaborated by reminding the jury that the police knew that the location Petitioner claimed to be had security cameras, but that police did not acquire those tapes, and therefore the prosecution failed to meet their burden of proof beyond a reasonable doubt. *Id.* at 508. Attorney Neel's strategy in her closing argument appears to rest on the concept that the police, fire department, and district attorney "made their mind up before they did any investigation" resulting in a failure to prove Petitioner's guilt beyond a reasonable doubt. *Id.* at 516.

Evidently, the jury did not find Attorney Neel's trial strategy persuasive as they found

---

[6] The Court notes that Attorney Neel's reference to "the people charged with investigating" included the police and the fire department, not the public defender investigator. *See* 2 RT 504-507.

Petitioner guilty of arson. However, an ineffective strategy does not in and of itself equate unreasonableness and therefore does not independently amount to ineffective assistance of counsel. *See Strickland*, 466 U.S. at 691 ("a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment"). Here, it was not inherently unreasonable for Attorney Neel to have made the tactical decision to disparage the police investigation rather than to search for Petitioner's unnamed alibi witnesses. *See Richter*, 562 U.S. at 109 ("To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates"). As in *Richter*, "[a]ll that happened here is that counsel pursued a course that conformed to the first option . . . . There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer negligence.'" *Id.* (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curium)). The state supreme court could have reasonably concluded that Attorney Neel's choice to focus on the police's faulty investigation rather than conducting her own was a reasonable trial tactic that does not surpass *Strickland*'s high bar. *See* 466 U.S. at 687.

Furthermore, the Court notes that Petitioner did not submit a declaration from any alibi witnesses. In the absence of a declaration by such a witness demonstrating what that witness would have said at trial, Petitioner cannot meet his burden to show prejudice affirmatively from the failure to uncover and call an alibi witness. *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (petitioner presented no evidence that alleged alibi witness "actually exists, other than from Dows's self-serving affidavit," and could not show that witness would have presented helpful testimony because he failed to present affidavit from witness). Finally, the prosecution offered multiple pieces of corroborating evidence, including: the presence of Petitioner's DNA on the gas can, *see* 1 RT 246-252; and eyewitness testimony placing Petitioner at the scene of the crime, *see* 2 RT 371-413.

Accordingly, the state supreme court's summary rejection of this IAC claim was not an objectively unreasonable application of the *Strickland* standard. Petitioner is not entitled to relief on Claim 1, and it is DENIED.

11

### B. Exclusion of Eyewitness's Criminal Record

#### 1. Background

Defense counsel had sought to cross-examine Mary Purify-Skillman ("Purify-Skillman"), the neighbor who testified as an eyewitness and placed Petitioner at the scene before and after the arson, about the fact that her "RAP sheet shows that she has suffered [a] prior felony conviction, and had been arrested and convicted of crimes involving dishonesty."[7] Dkt. 1 at 5, 13. The prosecution filed a motion in limine "to exclude the prior convictions for any purposes because of the significant length of time since her dishonest and unlawful acts." *Id.* Defense counsel acknowledged that the convictions were "remote in time," but she objected to the exclusion of such evidence. 1 RT 46. The trial court considered both parties' arguments during an evidentiary hearing and ultimately excluded the evidence of Purify-Skillman's prior convictions and arrests. 1 RT 46. The trial court determined as follows:

> Having done a 352 analysis, the probative value of these convictions . . . Welfare and Institutions Code [violation (felony welfare fraud) in 1975] . . . misdemeanor some kind of DUI in '98, '99 conviction, and then 2000, which . . . was a misdemeanor. . . . Given the most recent being 2000, 17 years ago, then, the felony being 18 years ago, I think its probative values are outweighed by concerns of undue prejudice and other considerations under 352.

*Id.* Again, given a lack of a reasoned state court decision, the Court will conduct "an independent review of the record" to determine whether the California Supreme Court's summary denial of this claim was contrary to or an unreasonable application of clearly established federal law. *Plascencia*, 467 F.3d at 1197-98; *Himes*, 336 F.3d at 853.

#### 2. Applicable Law

##### a. Right to Cross-Examine Witnesses Against Him

A defendant meets his burden of showing a Confrontation Clause violation by showing

---

[7] Purify-Skillman's RAP sheet included the following arrests and convictions: an arrest in 1975 for California Penal Code § 647(b) (prostitution); an arrest and conviction of Welfare and Institutions Code ("WI") § 11483 (obtaining aid by fraud); a 1998 conviction for driving under the influence and Vehicle Code § 20002(a) (misdemeanor hit and run); a 1999 conviction for a felony violation of WI § 10980(c) (felony welfare fraud), and a misdemeanor WI § 10980(c)(2) (fraud to obtain aid); a 2000 arrest for California Penal Code § 69 (resisting an officer), and driving on a suspending license; and a 2000 arrest for prohibited person with firearm, which was dismissed. *See* 1 CT 122.

12

that "[a] reasonable jury might have received a significantly different impression of [a witness's] credibility had . . . counsel been permitted to pursue his proposed line of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). However, the Confrontation Clause does not prevent a trial judge from imposing reasonable limits on cross-examination based on concerns of harassment, prejudice, confusion of issues, witness safety, or interrogation that is repetitive or only marginally relevant. *Id.* at 679. The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. *See Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). To determine whether a criminal defendant's Sixth Amendment right of confrontation has been violated by the exclusion of evidence on cross-examination, a court inquires whether the evidence was relevant, whether there were other legitimate interests outweighing the defendant's interests in presenting the evidence, and whether the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness. *United States v. Beardslee*, 197 F.3d 378, 383-84 (9th Cir. 1999), *amended*, 204 F.3d 983 (9th Cir. 2000).

### b. Right to Present a Defense

The United States Constitution gives a criminal defendant the right to present a defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted). The Compulsory Process Clause of the Sixth Amendment preserves the right of a defendant in a criminal trial to have compulsory process for obtaining a favorable witness. *Washington v. Texas*, 388 U.S. 14, 19 (1967). But the right is only implicated when the evidence the defendant seeks to admit is "relevant and material, and . . . vital to the defense." *Id.* at 16.[8] The Sixth Amendment right to present relevant testimony "may,

---

[8] To determine whether the excluded evidence is relevant and material, the court may consider the following factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *See United States v. Stever*, 603 F.3d 747, 755-56 (9th Cir. 2010) (quoting *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985), *amended*, 768 F.2d 1090 (9th Cir. 1985)).

in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973); *Taylor v. Illinois*, 484 U.S. 400, 410-11 (1988) (right to compulsory process is not absolute). The Court has explained that a defendant "'does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'" *Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (plurality opinion) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)) (brackets in original). Even relevant evidence may be excluded on account of certain evidentiary rules. *See id.* at 42. "[T]o say that the right to introduce relevant evidence is not absolute is not to say that the Due Process Clause places *no* limits upon restriction of that right"; rather, it means that the defendant has the heavy burden to show that the decision to exclude evidence "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Id.* at 43 (citation omitted). Even if the exclusion of evidence was a constitutional error, habeas relief is not available unless the erroneous exclusion had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 638.

### 3. Analysis

As mentioned above, the trial court found that allowing impeachment using Purify-Skillman's criminal record (i.e., her prior convictions and arrests for crimes of dishonesty) was unduly prejudicial because of the significant length of time since the convictions and arrests. 1 RT 46). The California Supreme Court's summary denial of Petitioner's claim challenging the trial court's exclusion of such evidence under California Evidence Code § 352 was not contrary to, or an unreasonable application of clearly established federal law. Section 352, like its federal analog, Federal Rule of Evidence 403, is a rather commonplace kind of evidentiary rule allowing the exclusion of evidence where its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time, be unduly prejudicial, confuse the issues or mislead the jury. As explained below, the application of section 352 in Petitioner's case to exclude the aforementioned evidence did not result in a Confrontation Clause violation. Nor did it violate Petitioner's right to present a defense.

First, Petitioner has not identified any Supreme Court holding to the effect that an evidence

14

rule that (like California Evidence Code § 352) allows the exclusion of evidence when its probative value is outweighed by undue time-consumption or issue confusion violates the constitutional rights to present a defense or due process. Thus, Petitioner has failed to show that California Evidence Code § 352 "offends some 'fundamental principle of justice'" such that the rule itself violates a criminal defendant's right to due process. *See Montana v. Egelhoff*, 518 U.S. at 43; c*f. Van Arsdall*, 475 U.S. at 679 ("trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant").

The Confrontation Clause guarantees criminal defendants the right of cross-examination, which includes exploration of bias.[9] *See Davis v. Alaska*, 415 U.S. 308, 315-316 (1974).

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Van Arsdall*, 475 U.S. at 679. Exclusion of impeaching evidence on collateral matters which has only slight probative value on the issue of veracity does not infringe on the defendant's right of confrontation. *People v. Jennings*, 53 Cal. 3d 334, 372 (1991). This is because "'the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Van Arsdall*, 475 U.S. at 679 (quoting *Fensterer*, 474 U.S. at 20). The exclusion of specific lines of cross-examination is not error if there is "no substantial likelihood" that "the jury's impression of [the witness's] credibility" would have been changed. *Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013).

Here, Petitioner had a substantial opportunity to cross-examine Purify-Skillman on

---

[9] That Petitioner in this case sought to impeach Purify-Skillman on her prior convictions and arrests for crimes of dishonesty, rather than bias, is irrelevant for constitutional purposes.

15

relevant matters pertinent to her *present* credibility. *See* 2 RT 396-412. Because the limitation on cross-examination of Purify-Skillman only barred inquiry into her convictions and arrests from seventeen or eighteen years ago, the state supreme court could have reasonably found that no error resulted based on "no substantial likelihood" that the jury's impression of Purify-Skillman's credibility would have been changed. *See Sully*, 725 F.3d at 1075. Purify-Skillman's credibility was unlikely to have been particularly damaged by admission of her criminal record because of the significant length of time since the convictions and arrests, and she had not had any additional convictions since that time. No evidence exists in the record indicating that Purify-Skillman gained anything from testifying. Also, part of Purify-Skillman's testimony was corroborated by the following evidence: Dees testified that she and Petitioner had a disagreement that morning, *see* 1 RT 268; and the firefighters' lead investigator corroborated Purify-Skillman's suggestion that there had been an explosion, *see* 1 RT 163.

Finally, the evidence of Petitioner's guilt was overwhelming. Petitioner had turned up (and left unattended) the burners on the stove after arguing with his mother that morning. 1 RT 271. DNA testing confirmed that Petitioner's blood was on the gas can found in the bedroom. 1 RT 246-252. Petitioner gave inconsistent testimony about how he cut his hands, including that: (1) his dog bit him, *see* 1 RT 262; (2) he had been breaking sticks and bottles, *see* 1 RT 178-179, 263; and (3) he had accidentally cut his hand the day before by grabbing a knife accidentally from the sink, *see* 1 CT 288. Therefore, the Court finds that any error in excluding Purify-Skillman's prior convictions and arrests for crimes of dishonesty did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 637.

Accordingly, the state supreme court's summary rejection of this claim was not contrary to or an unreasonable application of clearly established Federal law. Therefore, Claim 2 is DENIED.

## V. CERTIFICATE OF APPEALABILITY

No certificate of appealability is warranted in this case. For the reasons herein, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the

16

Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

**VI.   CONCLUSION**

For the reasons outlines above, the Court orders as follows:

1.   All claims from the petition are DENIED, and a certificate of appealability will not issue.  Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2.   The Clerk shall terminate any pending motions and close the file.

IT IS SO ORDERED.

Dated: March 12, 2021

_____
JUDGE YVONNE GONZALEZ ROGERS
United States District Judge

17